## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                        :   CIVIL ACTION NO.:
ULTEGRA, LLC and                        :
GRETCHEN CHIPPERINI,                    :   3:09-cv-1284 (MRK)
                                        :
                    Plaintiffs,         :
v.                                      :
                                        :
MYSTIC FIRE DISTRICT, ET AL,            :
                    Defendants.         :
_____ :   AUGUST 20, 2013

### MOTION TO PRECLUDE EXPERT TESTIMONY ON DAMAGES OF PLAINTIFFS' EXPERTS KEN WOODWARD AND NORMAN BENEDICT, AND MOTION TO LIMIT PLAINTIFFS' DAMAGES, IF ANY, TO THE FAIR MARKET VALUE OF THE SUBJECT PREMISES JUST PRIOR TO THE FIRE

Pursuant to Federal Rules of Evidence 104 and 702, Defendants **Mystic Fire District, Christopher May, Kyle Hilbert, Chris Paige, Brian Molkenthin and Nickolas Allyn**, respectfully move for an order precluding any and all testimony from plaintiffs' experts, Mr. Ken Woodward and Mr. Norman Benedict, on the issues, respectively, of the appraised market value of the residence just prior to the fire, as well as the cost to repair same.

As set forth in detail below, the expert opinions of Mr. Benedict are not reliable, are not based on recognized appraisal methods under the Uniform Standards of Professional Appraisal Practice (USPAP), and are therefore inadmissible.  Similarly, the expert opinions of Mr. Woodward are likewise not reliable, are not based on a recognized approach to cost estimating, do not factor in depreciation, and are designed to improperly inflate the cost of reconstructing the subject residence.  In addition, neither of experts' opinions represents the proper measure of damages under Connecticut law

for the total loss of real property.  The expert opinions are therefore inadmissible, and the plaintiffs' damage claim, under Connecticut law, should be limited to the fair market value of the house at just prior to the fire.

**I.      BACKGROUND**

Chipperini purchased the subject, single family, home at 23 Library Street, located within a few blocks from downtown Mystic, in 1989 for $417,500.00. No property insurance was taken out on the house at the time of the loss.  Upon information and belief, no one has ever resided in the house since purchase in 1989, and there has been little to no furniture in place since then.     Instead, Miss Chipperini began renovating the house soon after purchase beginning in the early 1990s.  In 2000, the Town of Groton appraised the property for tax purposes at $435,900.00.   In an appeal by Chipperini of that tax assessment, Chipperini's expert appraiser, Mr. Robert Silverstein, opined in 2005 that the subject property had a fair market value of $315,000.00, based on several comparable sales in the immediate neighborhood, and that the cost to finish the remaining renovations to the property was estimated to be approximately $145,000.00. See, Post-Trial Briefs, dated June 27, 2005, of Inge Chipperini and Gretchen Chipperini, and The Town Of Groton, attached hereto and marked as **Exhibit 1**.

On July 24, 2008, William Celtruda intentionally burned down the plaintiff's home in Mystic, Connecticut.  The house was a total loss.  In this lawsuit, plaintiffs Ultegra, LLC and Gretchen Chipperini (hereinafter "Chipperini") seek to recover monetary damages from the defendants for the loss of this home and, toward that end, disclosed Mr. Ken Woodward, from Petra Construction, Inc., and Mr. Norman Benedict of Norman Benedicts Associates, Inc., as expert witnesses.

Chipperini now claims in this lawsuit, through her experts, that her home had a "value to her" and/or a replacement/repair cost value in excess of $7,500,000.00.[1]

     a.     ***Mr. Norman Benedict's Report and Opinions***

Mr. Benedict is a certified real estate appraiser.   He was charged with appraising the Chipperini home just prior to the fire, and purported to do so in compliance with two of three recognized approaches to appraising property under the standards and regulations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), namely the "sales comparison approach" and the "cost approach".[2]   See, Selected Portions of Norman Benedict's Report, dated September 30, 2011, attached hereto and marked as **Exhibit 2**.

In this regard, Mr. Benedict notes that his report was prepared in "accordance with the directions provided and in compliance with the regulations set forth under the Uniform Standards of Professional Appraisal Practice (USPAP)."    Critically, Mr. Benedict further indicates that his "VALUATION ANALYSIS" provides a "retrospective estimate of the **MARKET VALUE** of . . . the destroyed building as of the date of the fire of July 25, 2008." (Emphasis added).  See, Page 4 of Cover Letter to Benedict Report, **Exhibit 2**, 4th page.    In the "Technical Terms Used in this Appraisal Report", appended to Mr. Benedict's report, Mr. Benedict cites to *The Dictionary of Real Estate Appraisal*,

---

[1] Defendants' Expert, Mr. Al Franke, will testify that in 2007-08 the highest price paid for a home in Mystic was $1,750,000.00, which was a property located on the Mystic River with direct views of Mystic Seaport.  He has opined based on a sales comparison approach that the Chipperini home, less the real property on which it stood, had a fair market value of $605,000.00.

[2] The sales comparison approach is defined by USPAP as follows: a procedure to conclude an opinion of value for a property my comparing it with similar properties that have been sold or are for sale in the relevant marketplace by making adjustments to prices based on marketplace conditions and the properties' characteristics of sale.   The cost approach is defined as follows: a procedure to estimate the current costs to reproduce or create a property with another of comparable use and marketability.

Fifth Edition, 2010, published by the Appraisal Institute, for the definition of "MARKET VALUE" – these various definitions all assume what a willing buyer would pay and a willing seller would accept, in an arm's length transaction, free of duress on both sides, with both parties acting prudently and knowledgeably.  **Exhibit 2**, pp. "BC and BD", appended to Benedict Report.

In reality, Mr. Benedict's report is not a "market value" appraisal based on sales comparisons as required by USPAP.  Rather, and as set forth below, Mr. Benedict utilized, as confirmed in his deposition, an appraisal approach that he has developed on his own, that is unknown and unrecognized in the world of appraisals, and that he has never utilized on residential properties.

     *i.*    *Chipperini's Request for Expert Witness Services from Benedict*

Preliminarily, Chipperini sent Mr. Benedict an email dated August 4, 2011, just prior to retaining Mr. Benedict as an appraisal expert.  In the email, Chipperini states as follows:

> I believe I would enjoy working with you.  It appears that much of your experience is in the unusual of the commercial/industrial, which is just fine with me but have you done much in the unique residential area? Since I feel strongly about the use of the cost approach being the best approach for my property I think someone in the commercial area would be the best since it is done more often in this area.  **However, I have had appraisers tell me that you have to at least prove that the sales approach is not the most accurate method and/or you have to broaden the market for potential buyers who would be looking to purchase all along coastal Connecticut into Rhode Island.**  Some even have suggested to find comparisons with all the exotic wood custom woodwork in my house all the way to Southern Maine and Vermont where I guess there are more high end interior woodwork houses of the shingle style, I did not know this.

> **Email dated August 4, 2011**, attached hereto and marked as **Exhibit 3**.

      ii.     Benedict's "Value to Chipperini" Disguised as a "Sales Comparison" Appraisal.

Benedict's appraised value of $7,765,000.00, although claimed to be based in part on a "sales comparison approach", is really Mr. Benedict's opinion as to the value of the house to Mrs. Chipperini, personally, a "value in use".   Specifically, Mr. Benedict testified in his deposition that the purpose of his appraisal was to "estimate the value of the property **to Miss Chipperini**."   See, <u>Deposition Testimony of Mr. Benedict</u>, at page 86, attached hereto and marked as **Exhibit 4**.  More specifically, Mr. Benedict testified that he wrote his report:

> in response to a question that was asked me: What was my house worth to me. . . . I didn't write my report for the court.  I'm not looking for a value for the court.  I'm looking to answer [for] Miss Chipperini what was her house worth to her in the instant before the fire.

**Exhibit 4**, at pp. 151-52.

Later in the deposition, Benedict further testified as follows:

Q:  Okay.  Let's assume in this hypothetical divorce there are actual sales, there are slight differences and you make adjustments.  And based on those actual sales, comparisons with adjustments, you come up with a value of the home and the property for this divorce, is that fair?
A.  Value in exchange.
Q.  What does that mean?
A.  That means a seller is going to exchange it with a buyer.
Q.  That's right.  That's where I'm getting to.  Under those circumstances you are providing the people and the court a value based upon what you anticipate a willing buyer would get it for, correct?
A.  And a willing seller in a normal amount of time and all the requirements of the definition of market value.
Q.  Right.  But it is driven by the market, a buyer and a seller?
A.   Because we're doing value and exchange.
Q.  Right.  With Miss Chipperini's property **you didn't undertake that analysis, correct**?

A.   No.  **I did a value in use, the value to her**. [3]

**Exhibit 4, at pp. 139-40**

   iii.      *Benedict's Appraisal Based on Novel Technique*

Benedict appraises the subject property pursuant to "techniques" of appraising property called the "Overall Market Comparison Technique[4]" and "Individual Market Comparison Technique[5]" and which are "defined by NORMAN BENEDICT ASSOCIATES, INC. and ENVIROVAL, INC."  Exhibit 2, pp. 90-93.

   Thus, Benedict has developed them and defined them for his own use.  No one else does.

   These "techniques" allow Mr. Benedict to examine properties, contrary to the "sales comparison approach" as set forth in USPAP and every other standard governing this appraisal approach, far beyond the immediate surrounding geographical area of Mystic CT, for 20 comparable houses on the market or sold in the lower Fairfield County and Westchester County region. (the purported "overall market").  This market, close to

---

[3] The Dictionary of Real Estate Appraisal, Fifth Edition, 2010, and as included in Mr. Benedict's glossary of terms, defines "VALUE IN USE" as follows: "the value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal.  Value in use may or may not equal market value but is different conceptually."   Thus, Mr. Benedict's analysis employs the use of his own novel approach to comparable sales not based on market value and claims that value is the "value in use" of the property to Miss Chipperini – another way of saying what "Mrs. Chipperini has lost."    This is not a recognized approach to appraising real property.  And "value in use" is not an appropriate appraisal method for an unoccupied single family home.
[4] The Overall Market Comparison Technique is defined by NORMAN BENEDICT ASSOCIATES, INC. as follows: "A Valuation technique, with the Sales Comparison Approach, in which the appraised land, or property, is compared to the single overall real estate market unit price which summarizes the total real estate market or databased studied.  Differences are adjusted for and a value indication for the appraised land and/or property, is developed by comparison."  USPAP does not recognize this "technique".
[5] The Individual Market Comparison Technique is defined as follows: "A valuation technique, within the Sales Comparison Approach, in which the appraised land or property is compared to individual sales prices of three or more similar land or property sales.   Differences are adjusted for and a value indication for the appraised property is developed."  USPAP does not recognize this "technique".

New York City, and containing some of the highest priced homes in the country, bears no resemblance to eastern Connecticut. Nonetheless, Mr. Benedict selects twenty properties (ranging in prices from $5,000,000.00 to over $10,000,000.00 in Greenwich, Darien and Westport), and then narrows those twenty down to three under his "individual market comparison technique", making subsequent adjustments, to arrive at his appraisal under his modified "sales comparison approach".   **Exhibit 2**, pp. 90-105.

However, Mr. Benedict does not use these comparable sales to actually arrive at an appraisal based on the "market value" as defined by USPAP, i.e., what a willing buyer would pay and a willing seller would accept in an arm's length transaction of the subject premises.   Rather, Mr. Benedict employs his "Overall Market Comparison Technique" to produce a "value indication" for the Chipperini property, which Mr. Benedict self-defines as follows:

> "if the typical buyer of the appraised property has gone out and studied other properties offered for sale, and sold properties whose market motivations have been expressed to him.  He (apparently the hypothetical buyer) then reacted to the market as a whole and based upon the entire market as a single entity, it inter-collated a value for the property that they were desirous of buying."

Benedict's Report at pg. 108.

Setting aside precisely what that sentence means, the defendants, by and through counsel, are unaware of any group, appraisal association, professional entity, article, peer reviewed study or individual appraiser employing such an appraisal analysis.   Upon information and belief, this technique for appraising has never been recognized in a court, something Mr. Benedict confirmed in his deposition.

Q:  Where can I go to research, to find out how an expert appraiser did just what you said?

A:  Buy a copy of the textbook and start to read it.

Q.  What's the textbook?

A.  The Appraisal of Real Estate.

Q.  And will it have a chapter generally speaking on appraising of unique properties based on the value to the use of the owner?

A.  No.

Q.  Okay.  Where do I find that?

A**.      In the experience of appraisers who have been at it for a long time**.

Q.      Is it a correct statement that I'm making now that the appraisal of a house under the sales approach based on its value to the owner and the owner's use is something that you are the author of?

A.      No.  Other appraisers have done it, but it's not a part of the regular practice.  It's unusual to be requested to do what is independent of land or what is an apartment building worth independent of land.  Those are unusual requests.  And the young appraiser is not exposed to them yet.

Q.      Who made the request of you?

A.      Miss Chipperini.

Q.      And in the course of your years have you ever given such a report with that criteria?

A.      As I've told you before, I will have to look at my office records.

Q.      And there is no place I can go to see whether there is a group, peer review, organization that's determined whether this is a valid basis to appraise a house? Is that fair?

A.      **Not that I can think of.  I would have answered you this morning, but I don't know of such a source.**

**Exhibit 4**, pp. 145-47.


Benedict then confirmed that he did not conduct an appraisal based on market

value or a bargained for exchange:

Q:       Did you undertake but then not include an analysis of what the value of her house would be in exchange?

A:       Never studied it.  Wasn't hired to do it and wasn't paid to do it.

Q:       Do you have an opinion as to what the value of her house was on the day before the fire in a sales comparison approach in exchange?

A:       As I testified this morning, under USPAP I cannot have a value unless I have a fully documented file.  And I have never been asked to do that appraisal.  I have never developed a file or study on that question.

> Q:      If there is an expert report out there that has a sales comparison approach under the in exchange model, you would have no basis to challenge it; is that fair?
> A:      Yes, I could challenge the qualification of the appraiser to express an opinion.
> Q:      I'm talking about the value of it.
> A:      Right.  I could challenge the ability of the author to express that opinion of value.
> Q:      Absent the challenge of [the appraiser's] qualifications, you haven't the research to - -
> A:      No, I have not.

Id., at 153.

Mr. Benedict then went on to testify that he could not think of another residential appraisal performed in the manner he performed the Chipperini appraisal.

> Q.      And can you give me the name of one case where you've rendered this same type of opinion as you have in this case?
> A.       I've done it in industrial properties with some frequency.
> Q.      Residential?
> A.      I don't do regular residential appraisals.  I do unusual residential appraisals.  I do estates.  I don't do the 1200 square foot Cape Cod.  That I leave to residential appraisers.
> Q.      So can you answer this question for me:  Have you ever prior to this report rendered an opinion of the value of a residence based on its use to the owner?
> A.      I would have to check my records to answer that for you.

Id., at pp. 141-142.

### b. Cost Approach of Mr. Benedict.

Mr. Benedict's "cost approach" analysis fairs no better.   His approach makes one critical assumption: that the Chipperini residence may be classified as a "special purpose" property.   **Exhibit 2**.  On page 84 of his report, Mr. Benedict states "[t]he Cost Approach is considered to be the most reliable method of estimating the Reproduction,

or Replacement, cost of a building that would be classified as **Special-Purpose**." **Exhibit 2.**  As set forth below, the Chipperini residence – a single family home – cannot be deemed, as a matter of law, a special use or specialty property so as to justify a replacement cost less appreciation valuation.   Indeed, Mr. Benedict testified in his deposition that he could think of no time over his over 60 years of experience where he testified in court or by way of deposition that a single family home with high end woodworking and mechanical systems is a "special purpose".   **Exhibit 4**, pg. 62-63. ("Q: I need to know any case where you've testified in trial or in deposition where you've determined a house is so unique that it falls under the special purpose category? A: I can't think of one offhand.)[6]

> c.   *Mr. Ken Woodward's Opinions and Reports*

Chipperini's home was a total loss following the fire on July 25, 2008.  In 2011, Chipperini sold her interest in the real property where her home once stood.   Chipperini cannot, therefore, build a home on that property.   Due to Chipperini's total loss, and the subsequent sale of her real property, the proper measure of damages is the fair market value of the house just prior to the fire.

Nonetheless, Mr. Woodward's opinions on the cost to repair or reproduce the Chipperini are as follows:  he assumed that the building was virtually new at the time of the fire 2008.   In fact, the Chipperini home was built in the early 1900s.   It had one full

---

[6] Mr. Benedict indicated that one property he has appraised, a 52,000 square foot home with 10 miles of underground cable, including a car port for 7 vehicles, was in his opinion a "specialty property".  He also testified to a second home that the owner built a son's bedroom to look like an exact replica of a captain's state room.  Even assuming they are, which is denied, the Chipperini residence is an in-town single family home built in the early 1900s, and renovated over many years, without completion.  There is no special purpose to it, except in the subjective belief of Chipperini herself.

bathroom, and one half bathroom.   In 2000, the Town of Groton appraised the property

for tax purposes at $435,900.00.

Against this backdrop, Woodward opines that the cost to rebuild the house is

$,7,300,000.00 (rounded).   A breakdown of just some of Mr. Woodward's estimate is as

follows:

> $1,480,000 for General Conditions
> $243,700 for Sitework
> $250,000 for Foundations, Concrete and Masonry
> $40,000 for structural steel/misc.
> $1,789,095.60 for exterior and interior wood, carpentry
> $316,072.74 for Thermal and moisture protection
> $356,242.44 for Doors, glass and hardware.
> $1,045,000 for finishes – painting, staining, tile
> $175,000 for Heating, AC and Plumbing

> See, **Report of Ken Woodward**, attached hereto and marked as **Exhibit 5**.

In addition, Mr. Woodward assumed that Mrs. Chipperini, working alongside

other master mill workers and carpenters, had rough timber delivered to the premises,

where it was subsequently milled into rough lumber by persons hired by Mrs. Chipperini

while working on milling equipment in her house.  This rough lumber was then cut into

linear boards, sanded, planed and then formed into various custom wood work, including

crown moldings, floor boards, raised paneling, etc.   Based on this information, Mr.

Woodward provided an estimate to rebuild the Chipperini that includes the cost of

rebuilding in the SPECIFIC MANNER in which Chipperini and her carpenters performed

the work on site.

In his deposition, Mr. Woodward testified as follows:

Q.  Now all the labor before that, getting raw wood, cutting it into rough stock, sanding it, cutting it, making it level and plane, all of that, did you charge in this estimate for all that work?

A:  Yes.

Q:  Why?

A:  Why not? That's what I was asked to do.

Q:  Right.  But when you go to the mill work shop and say I need 250 linear feet of poplar wood with this profile, you get a price for that, right?  And it includes cutting the tree down.  Cutting it shorter.  Sanding it.  Making it level and plane and putting a profile on it, right?  Is that usually how the real world works?

A:  That could be how it works.

Q:  Isn't that how the real world works?

A:  That's how it works a lot of the time. If you asked me to take this rough lumber and give me an estimate to mill it, plane it, all blah-blah everything, and then install it, I would give you an estimate.

Q:  And I want to be fair to you.  That's what Miss Chipperini has asked you to give a quote for right?

A:  Right

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

Q:  And you've done what Miss Chipperini has asked you to do, right?

A:  And Tom Edwards, yes.

Q:  Okay.  And in doing that, they asked you to make one big assumption.  They wanted you to charge the labor for taking the wood from the beginning and bring it to a finished product, right?

A:  Correct.


Based on these assumptions and requests by Miss Chipperini and Mr. Edwards, Petra Construction, Inc., through Mr. Woodward, has estimated that cost for THE WOODWORK ALONE is in excess of 1.7 million dollars.   As with the appraisal authored Mr. Benedict under his novel sales comparison approach, Mr. Woodward's estimate does not represent the cost of rebuilding the house – it represents the VALUE of rebuilding the house in the manner in which Miss Chipperini allegedly renovated it.

In addition, Mr. Woodward assumed that the house was recently renovated was in new or near new condition, resulting in him not deducting any amount for depreciation.

In fact, Chipperini had been renovating her house since the early 1990s.[7]   He also

confirmed that if this was not the case, his report would have to be redone:

> Q:      But haven't you assumed that the house and its systems were newly renovated?
> A:       Yes, that's the information I had.
> Q:      Okay.  And if that turns out not to be true - -
> A:      I gotcha.
> Q:      -- if that turns out not to be true, can you testify under oath that this is an accurate estimate of what it would cost?
> A:      It would have to be reevaluated, so that would mean the answer is no.
> Q:      Right.  It would have to be re-evaluated to factor in among other things depreciation?
> A:      It would have to factor in a lot of things.
> Q:      And at this stage if this house was not in a newly renovated condition for systems and interior, you can't testify about the value of the construction, right?
> A:      I can only testify what was given to me, that's correct, yes.

> <u>Deposition of Mr. Ken Woodward</u>, pp. 127-128, attached hereto and marked as **Exhibit 6**.

As is apparent, the opinions of Mr. Woodward incorrectly assume that the

Chipperinin was newly renovated as of 2008.  It wasn't.


II.    <u>**LEGAL STANDARDS**</u>

    a.   <u>Expert Testimony</u>

---

[7] Thomas Edwards, an architect, has issued a report wherein he details the construction/renovation of the Chipperini residence.  Mr. Edwards notes in his report that the renovation work at the house began in 1990.  His report does not provide when any of the construction detail put into the home was completed.   See, **Exhibit 7**, Portions of Mr. Edwards' Report.   However, a photograph of the Chipperini house, stamped January 1, 1995 on the bottom of the picture, shows that the lion's share of the exterior renovation, including the installation of a cupola, was performed before 1995.  **Exhibit 9**.   As such, the vast majority of the exterior of the home would have been renovated at least 13 years before the fire and was not "new".  In addition, if Chipperini installed, for example, a high end furnace in 1991, shortly after purchase, it was 17 years old at the time of the fire in 2008.  Yet, Mr. Woodward's estimate assumes that all renovations were recent and the home was almost new in 2008, thereby justifying his estimate of, for example, the replacement cost in 2008 pricing of a high end furnace.   The plaintiffs' expert's opinions and reports, by and through Chipperini, are simply designed to mislead the jury, and do not reflect the measure of damages under Connecticut law for the complete loss of a home.

A Motion to Preclude requests that the District Court, in advance of a trial, make preliminary determinations of the admissibility of the evidence under Federal Rule of Evidence 104.   When such a motion involves expert testimony, Federal Rule of Evidence 702 is implicated.   Rule 702 provides in pertinent part, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier in fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.   In the event the District Court determines that an expert's testimony does not meet these standards, then the court should preclude the evidence. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142-44, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

The United States Supreme Court has held that Rule 702 of the Federal Rules of Evidence imposes a "special obligation" on the trial court to make sure both scientific testimony; _Daubert v. Merrell Dow Pharmaceuticals, Inc_., 509 U.S. 579, 589 (1993); and all other expert testimony; _Kumho Tire Co., Ltd v. Carmichael_, 526 U.S. 137, 147-49; meets the requirements of Rule 702.

The trial judge, in fulfilling its "gatekeeper function", can rely on several factors bearing on the reliability of the proposed testimony, including: (1) whether a theory or technique can be or has been tested; (2) whether it has been subject to peer review and publication; (3) whether the particular theory has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique is generally accepted in the relevant scientific community.  _Kumho_, 526 U.S.

at 147-49.    The trial judge's inquiry is directed to the reasonableness of using an approach to draw a conclusion regarding "the particular matter to which the expert testimony was directly relevant.   _RFMAS, Inc. v. So_, 748 F.Supp.2d 244, 250 (S.D.N.Y. 2010).

"If the basis of an expert's testimony is called into question, it is the job of the trial Judge to decide whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.   The court's inquiry is flexible, based on the nature of the case, the expert's particular expertise and the subject matter of his or her testimony.   The expert's testimony must be grounded in an accepted body of learning and experience in the expert's field, and the expert must explain how the conclusion in so grounded.   _Ryan v. National Union Fire Insurance Co. of Pittsburgh_, 2010 WL 2232670 (Droney, U.S.D.J.) (internal citations and quotations omitted).

Appraisers, and other purported damage experts, have been subject to _Daubert_ motions to preclude.   _Development Specialists, Inc. v. Weiser Realty Advisors, LLC_, 2012 WL 242835 (2012), United States District Court, S.D. New York (Forrest, U.S.D.J.) (order precluding plaintiff's real estate appraiser from testifying as an expert on the value of law firm's sub-lease); _U.S. v. 25.202 Acres of Land_, 860 F.Supp.2d 165 (N.D. New York 2010) (appraiser's opinion on income capitalization approach to value deemed not reliable); _Heidorf v. Town of Northumberland_, 985 F.Supp. 250 (1997) (motion to preclude defendant's appraiser's valuation denied as defendant's appraisal was proper measure of damages).

b.  <u>Damages for the loss of real property under Connecticut Law</u>.

Under Connecticut law, the basic measure of damages for injury to real property is the resultant diminution in value of the plaintiff's property caused by the defendant's conduct.  <u>Whitman Hotel Corporation v. Elliot & Watrous Engineering Co</u>., 137 Conn. 562, 573 (1951); <u>Willow Springs Condominium Assn. Inc. v. Seventh BRT Development Corp</u>, 245 Conn. 1, 59-60 (1998).    In some circumstances, proof of the resultant diminution in value in real property may been "determined by the cost of repairing the damage, provided, of course, *that that cost does not exceed the former value of the property and provided that the repairs do not enhance the value of the property over what it was before it was damaged*." <u>Willow Springs Condominium Assn</u>., *supra*, 245 Conn. at 59; <u>Mattegat v. Klopfenstein</u>, 50 Conn. App. 97, 107, cert. denied, 247 Conn. 922 (1998).

Because the fire at the Chipperini residence caused a total loss of the subject property, the proper measure of damages is the fair market value of the house just prior to the loss.   This is so because there is nothing left to "repair".   In addition, Chipperini no longer owns the property on which the house stood.   Accordingly, there is no house to "repair" or "rebuild".   Moreover, Chipperini's cost estimates assume the construction of a brand new, state of art home, based on the incorrect belief that Chipperini's 100 year old house was virtually new when the fire took place.

III.    **LAW AND ARGUMENT**

A. **THE TESTIMONY OF MR. BENEDICT AND MR. WOODWARD SHOULD BE PRECLUDED UNDER KUMHO TIRE**

**a. Mr. Benedicts' appraisal opinions are not based on the fair market value of the Chipperini Residence and are not an accepted method of appraising real estate; the appraisal is based on a value to Miss Chipperini, and Miss Chipperini alone.**

"It is critical that an expert's analysis be reliable at every step. _Amorgianos v. Amtrak_, 303 F.3d 256, 267 (2ᵈ Cir. 2002). The reliability analysis applies to all aspects of the expert's testimony, including methodology, the facts underlying the opinion, and the link between the facts and the conclusion. _Heller v. Shaw Industries, Inc._, 167 F.3d 146, 155 (3d Cir. 1999)." _U.S. v. 25.202 Acres of Land and Buildings Affixed to Land_, 860 F.Supp.2d 165 (2010).

Notably, one court recently held that it "can find nothing credible" about Mr. Benedict's "personally developed" analysis involving his "Overall Market Approach" in a commercial tax assessment case tried to the court. _The May Department Stores Co. v. City of Meridan_, 2011 WL 2739442, attached hereto and marked as **Exhibit 8**. The court went on to note that the commercial properties used by Benedict as "comparables" under his "personal" approach are "far removed from being considered comparables". Most notably, the court held that "**no authoritative basis has been introduced in this action to show that this overall market or universe of sales approach is a generally accepted method of valuing real estate**." (emphasis added). Id., at page 7. As is apparent, this approach is simply not a recognized approach to residential real estate appraisal, particularly when Mr. Benedict feigns use of a "sale comparison approach" to find some unrecognized "value to Ms. Chipperini".

Under Connecticut law, the basic measure of damages for injury to real property is the resultant diminution in its value. _Blakeman v. Tobin_, 177 Conn. 597 (1979).

Connecticut law does not recognized a "loss in use" measure of damages.  Here, the property cannot be "repaired" so a cost analysis is not appropriate.    The plaintiff's measure of damages – because of the total loss of the home – is the fair market value of the home before the fire.   _Whitman Hotel Corporation v. Elliot & Watrous Engineering Co._, 137 Conn. 562, 573 (1951); _Willow Springs Condominium Assn. Inc. v. Seventh BRT Development Corp_, 245 Conn. 1, 59-60 (1998).

> **b.   The Benedict and Woodward reports and testimony regarding the cost to build the Chipperini residence should be precluded because such costs include the manner in which the residence was renovated by Miss Chipperini, do not account for depreciation and are not the proper measure of damages for the total destruction of real property.**

Mr. Benedict's cost approach assumes that the Chipperini residence is a "specialty property" or "special purpose" property.    It is not.  In addition, Mr. Benedict simply utilizes Mr. Woodward's estimate, itself not reliable, in formatting the "cost approach".     Because the Chipperini property does not meet any of the four requirements of a specialty property, and further because the property was a total loss, the proper measure of damages is the fair market value at the time of the loss, not replacement cost less depreciation.

In the case of a "specialty property", the measure of damages may in certain circumstances be replacement cost of the property minus depreciation.    However, a "specialty property" must meet four requirements for replacement cost analysis to apply: (1) the improvement must be unique and specially built for the _specific purpose_ for which it was designed (2) the improvement must have been designed for a special use and _must be so specially used_: (3) there must be _no market for the type of property_ and _no_

*sales of property for such use*; and (4) the improvement must be an appropriate improvement at the time of the injury and its use must be *economically feasible and reasonably expected to be replaced.*   <u>Matter of County of Suffolk (C.J. Van Bourgondien, Inc</u>., 47 N.Y.2d 507, 419 N.Y.S.2d 52, 392 N.E.2d 1236, 1237 (1979) (emphasis added) (18.9 acre parcel on which nursery business had been conducted was specialty property subject to replacement cost value less depreciation, where there was no market for such property and improvements had been physically and economically reasonable).

Here, Mr. Benedict opines that the best use for this property is an historic, single family residence.   Thus, the Chipperini house meets none of the requirements of a specialty property.   See, <u>Heidorf v. Town of Northhumberland</u>, 985 F.Supp. 250 (1997) (church not a specialty property to owner, precluding use of replacement cost for damages, on the grounds that church was not used as church for many years).

Moreover, Mr. Woodward's opinions are simply the final result of what the plaintiff Gretchen Chipperini asked him to do.   Mrs. Chipperini asked Mr. Woodward to provide an estimate for rebuilding the house that reflects, in her subjective judgment, the amount of time and work she and her hired craftsman put into the work over a twenty year period.   Chipperini has no records reflecting this alleged time or work.   Thus, Woodward's estimate doesn't reflect what it would cost to build a replacement home, less depreciation; the estimate reflects what the current value of the repairs are to Miss Chipperini to build home that will not and cannot be built.   Such an approach is not a recognized measure of damages under Connecticut law for the total loss or real property.

**III.  CONCLUSION**

For all the foregoing reasons, the defendants respectfully request a
_Daubert/Kumho Tire_ hearing so as to determine whether the plaintiff's expert's testimony
is reliable and admissible or, in the alternative, an order precluding the plaintiff's expert's
for testifying at trial on the grounds that the measure of damages for the total loss of real
property is the resultant loss in the fair market value, and neither of the plaintiff's experts
have such an opinion.

                                    THE DEFENDANTS,


                                    ___/s/ Michael C. Deakin_____
                                     Michael C. Deakin, Esq.
                                     Federal Bar I.D. CT15376
                                     DEAKIN EDWARDS & CLARK, LLP
                                     245 Amity Road, Suite 200
                                     Woodbridge, CT  06525
                                     Phone:  (203) 387-5100
                                     Fax:  (203) 387-5101
                                     mdeakin@deakinedwardsclark.com

**<u>CERTIFICATION</u>**

I hereby certify that on August 20, 2013 a copy of the foregoing was filed electronically and served on any person unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the court's electronic filing system or by mail to any person unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

John Carta, Esq.
31 North Main Street
Essex, CT  06426
(E-mail: john@cartalaw.com)

William A. Celtruda
Inmate No.: 361946, Corrigan-Radgowski Correctional Center
986 Norwich-New London Tpke
Uncasville, CT 06382

Eugene Cushman, Esq.
One Post Hill Place
New London, CT  06320
(Email:  arco.corp@snet.net)

　　　　　　/s/ Michael C. Deakin___
Michael C. Deakin, Esquire